**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **VIRGINIA STREET FIDELCO, L.L.C., et al.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ORBIS PRODUCTS CORPORATION, et al.,**<br><br>**Defendants.** | Civ. No. 11-2057 (KM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs in this action seek recovery for the cost of remediating alleged environmental contamination on a piece of property (the "Orbis Site") in Newark. They have brought this action under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended by the Superfund Amendment and Reauthorization Act of 1986, 42 U.S.C. § 9601, *et seq.* ("CERCLA"). In addition, plaintiffs seek recovery under various New Jersey statutes and common law causes of action.

Before the Court are the remaining defendants' motions for summary judgment (ECF nos. 120-122). Plaintiffs oppose the motions but have not filed a cross-motion for summary judgment. For the reasons discussed below, I will partially grant defendants' motions. The intention of this opinion is to dispense with unnecessary issues and poise the matter for settlement or a bench trial.

## I. FACTUAL BACKGROUND

Plaintiff City of Newark is the current owner of an allegedly contaminated property located at 55 Virginia Street in Newark, New Jersey. The City became the owner of the property as a result of a foreclosure in the late 1990s. (ECF no. 65, Second Amended Complaint ("2AC") ¶¶ 36-37) Plaintiff Virginia Street

Fidelco, L.L.C. ("Virginia Street") is the contract purchaser of the property. (2AC ¶ 1). Plaintiffs bring suit against a number of companies, and individuals affiliated with those companies, claiming that they are responsible for contamination of the land prior to the City's ownership.

Orbis Products Corporation ("Orbis") maintained a chemical plant on the property for some sixty years, beginning in the 1920s. (2AC ¶ 34) The plant produced various flavor and fragrance products. Business declined, and in 1983, Orbis began decommissioning the plant. Plaintiffs contend that, while operating the plant, Orbis discharged hazardous substances on the property, requiring remedial action, then and now. (2AC ¶¶ 35, 38)

Orbis is a wholly-owned subsidiary of Adron, Inc. ("Adron"). (ECF no. 136 pp. 11-12) Until 1985, Adron operated under the name "Norda" (specifically, Norda, Inc. and Norda Essential Oil & Chemical Company, Inc.).[1] (*Id.*) In addition to the Orbis Site, Adron owned two other facilities that manufactured chemicals, pharmaceuticals and the like; those facilities were located in Boonton and East Hanover, New Jersey. (ECF no. 136 p. 12)[2]

A number of the defendants, including Orbis and Norda/Adron, have defaulted[3] or been voluntarily dismissed from the case. The remaining active defendants consist of one corporation, Flaroma, Inc. ("Flaroma"), and four individuals, William Amaducci, Robert Amaducci, the Estate of Louis Amaducci, and the Estate of Elena Duke Benedict. Each of these five remaining defendants has moved for summary judgment. In sum and substance, they argue that they are not responsible for any contamination to the Orbis Site, and that they cannot be held responsible based solely on their ties to Orbis/Norda/Adron. While I discuss the role of each defendant in greater detail in Section III, I will describe them briefly now.

---

1 I use the names "Norda" and "Adron" interchangeably throughout this opinion.

2 Plaintiffs do not specify whether Adron directly owned these facilities or via a subsidiary, as it did the Orbis Site.

3 *See* Clerk's entry of default, ECF entry dated October 11, 2011.

William Amaducci is the son of Louis Amaducci and the brother of Robert Amaducci. He became an employee of Norda/Adron in 1977. (ECF no. 120-1 p. 11) At some point in the 1980s, he also became Vice President of Orbis, until his resignation in the early 1990s. (*Id.* p. 13) William, along with Robert, co-founded Flaroma. He is also a director, shareholder, and the Treasurer of Flaroma. (*Id.*)

Robert Amaducci was the Executive Vice President of Norda/Adron and a member of its Board of Directors. (ECF no. 120-1 p. 10) For a period of time, beginning around 1983, he was also Vice President of Orbis. (*Id.*) Robert, a co-founder of Flaroma, is also its President, majority shareholder, and a member of its Board of Directors. (*Id.* p. 13)

Louis Amaducci, deceased, was the father of William and Robert Amaducci and the brother of Elena Duke Benedict. He was an officer and director of Adron/Norda and at one time was the President of Orbis. (ECF no. 136 p. 24; ECF no. 145 p. 6)

Elena Duke Benedict, also deceased, was Louis Amaducci's sister. She was an officer, director and controlling shareholder of Adron/Norda. (ECF no. 136 pp. 30-31; ECF no. 146 p. 9)

Flaroma is an entity co-founded by the Amaducci brothers. It sells "flavors and nutraceutical ingredients," some of which are manufactured by Adron. (ECF no. 120-1 p. 13) Plaintiffs allege that Flaroma was "set up to hold certain receipts and assets" of Adron. (2AC ¶ 25) According to plaintiffs, Flaroma was used to sell products of Norda/Adron in a way that would not violate Norda/Adron's non-compete agreement with another company. (ECF no. 136 p. 29)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III. DISCUSSION

### A. CERCLA (Counts I-III)

CERCLA was enacted "to promote timely cleanup of hazardous waste sites and to ensure that costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009). Plaintiffs assert claims under two separate provisions of CERCLA—Section 107, 42 U.S.C. § 9607 *et seq.*, and Section 113, 42 U.S.C. § 9613 *et seq.* Those two sections provide "clearly distinct remedies." *Bonnieview Homeowners Ass'n v. Woodmont Builders*, L.L.C., 655 F. Supp. 2d 473, 489 (D.N.J. 2009) (citing *Cooper Indsu., Inc. v. Aviall Serv., Inc.*, 543 U.S. 157, 163 125 S. Ct. 577 (2004) (internal quotations omitted). Section 107 provides a right to cost recovery from a responsible party, whereas Section 113 provides a right to contribution among responsible parties. *Id.* (citation omitted). I discuss each section in turn.

#### i. Cost Recovery (Count I)

In order to demonstrate liability under Section 107, a plaintiff must show that (1) defendant falls within one of four categories of potentially responsible parties; (2) hazardous substances were disposed of at a "facility"; (3) there has been a "release" or "threatened release" of hazardous substances from the facility to the environment; and (4) the "release" or "threatened release" has required or will require the plaintiff to incur "response costs." *Bonnieview*, 655 F. Supp. 2d at 494 (citing *N.J. Turnpike Authority v. PPG Indus., Inc.*, 197 F.3d 96, 103-104 (3d Cir. 1999)).

As to the first element, Section 107 defines four categories of potentially responsible parties ("PRPs"):

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for

disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

Defendants contend that they do not fall under any of these categories, and therefore cannot be liable under Section 107. Of relevance to the motions are "former owner/operator" liability under Section 107(a)(2) and "arranger" liability under Section 107(a)(3).

**1. Former Owner/Operator Liability**

Under Section 107(a)(2), a party qualifies as a PRP if "at the time of disposal of any hazardous substance, it *owned* or *operated* any facility at which such hazardous substances were disposed of." *Litgo New Jersey, Inc., v. Comm. New Jersey Dept. of Environmental Protection*, 725 F.3d 369, 383 (3d Cir. 2013) (citing 42 U.S.C. § 9607(a)(2)) (emphasis added).

The issue of ownership is often straightforward. In some cases, however, plaintiffs seek to hold responsible someone other than the legal owner of the facility: for example, a parent corporation on behalf of its subsidiary, or a corporate official on behalf of a company. In such circumstances, the parent corporation or corporate employee cannot be held liable unless there is piercing of the corporate veil. *See U.S. v. Bestfoods*, 524 U.S. 51, 63-64 (1998)("[W]hen (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions."); *Analytical Measurements Inc., v. Keuffel and Esser Co.*, 816 F. Supp. 291, 296 (D.N.J. 1993)(absent veil-piercing, shareholder of corporation that owned the facility could not be held to be an owner under CERCLA). Piercing the

corporate veil is appropriate where "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud." *Bestfoods*, 524 U.S. at 62.

The determination of who operates a facility, by contrast, is a functional one, which does not depend on ownership. Thus one can be deemed an operator of a facility under CERCLA without resort to veil-piercing.[4] *See Bestfoods*, 524 U.S. at 65 ("[A]ny person who operates a polluting facility is directly liable [under CERCLA] ... [t]his is so regardless of whether that person is the facility's owner, the owner's parent corporation, ... or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice."). In order to be deemed an operator, the person/entity must "manage, direct, or conduct operations specifically related to pollution, that is operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67. Such liability requires a "high degree of involvement." *New Jersey Dept of Environmental Protection v. Gloucester Environmental Management Services, Inc.*, 800 F. Supp. 1210, 1219 (D.N.J. 1992). The correct inquiry is not "whether the alleged operator had sufficient control to direct the hazardous substance disposal activities or prevent the damage caused," but instead "whether that individual participated in the hazardous substance disposal activities." *U.S. v. Tarrant*, Civ. No. 03-3899, 2007 WL 1231788, at *2 (D.N.J. 2007) (citing *Analytical Measurements*, 816 F. Supp. at 298).

**2. Arranger Liability**

As to "arranger" liability, the Third Circuit has identified three important factors: (1) ownership, plus either (2) knowledge or (3) control. *EPEC Polymers, Inc. v. NL Industries, Inc.*, Civ. No. 12-3842, 2013 WL 2338711, at *7 (D.N.J. 2013) (citing *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 676-80 (3d Cir. 2003)); *see also Ford Motor Co. v. Edgwood Properties, Inc.*, Civ. Nos. 06-

---

[4] A person or entity can also be derivatively liable for the operation of a facility if circumstances warrant piercing the corporate veil. *See Bestfoods*, 524 U.S. at 64 n.10. Direct operator liability appears to be the theory of liability intended here.

1278, 06-4266, 08-774, 2012 WL 4172133, at *14 (D.N.J. 2012); *U.S. v. D.S.C. of Newark Enterprises, Inc.*, Civ. No. 09-2270, 2013 WL 2658929, at *7 (D.N.J. 2013). Ownership requires proof of possession of the hazardous substance. *EPEC Polymers*, 2013 WL 2338711, at *8. In addition to ownership, the plaintiff must establish that defendant "maintained control over the process that resulted in the release of the hazardous waste *or* knowledge that such a release will occur during the process. *Id.* at *8 (internal quotations and citation omitted) (emphasis in original).

More recently, the Supreme Court has held that arranger liability requires a certain level of intent. *See Burlington Northern and Santa Fe Ry Co. v. U.S.*, 556 U.S. 599, 611-12, 129 S. Ct. 1870 (2009). "Under the plain language of the statute, an entity may qualify as an arranger under § 960(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* at 612; *see also Bonnieview*, 655 F. Supp. 2d at 493 ("[A]rranger liability under § 107(a)(3) requires an intent to dispose of hazardous substances.").

Arranger liability is to be construed "broadly" so as to fairly capture individuals responsible for contamination. *Morton*, 343 F.3d at 676.

**3. Applicability of PRP categories to the defendants**[5]

**a. William Amaducci**

Defendant William Amaducci assumes that plaintiffs allege only former operator liability under Section 107(a)(2). (ECF no. 120-1 p. 17) However, plaintiffs' brief also suggests "arranger" liability. (*See* ECF no. 136 p. 37 ("William Was an Operator and Arranger Who Participated in the Management of Waste Clean Up and Disposal.")). Therefore, I address both. I find that under both of these PRP categories, plaintiffs have raised issues of material fact sufficient to preclude summary judgment.

Plaintiffs point to evidence that William was an operator at the Orbis

5 Plaintiffs are not always clear about which categories of PRP status they believe apply to each defendant. (*See* ECF no. 136 p. 35 ("The Roles of Each of the Individual Directors and Officers Subject Them to Liability under CERCLA as Operators, Owners, or Arrangers.")) I discuss the categories that appear applicable based on the 2AC and the parties' briefing.

Site. For example, William frequently communicated with the New Jersey Department of Environmental Protection ("NJDEP") regarding environmental issues at the site. In December 1985, he received a letter from the NJDEP, directed to him as the "Manager" of "Orbis Products Company," addressing the storage of hazardous waste in tanks at the facility. (ECF no. 136-20 pp. 2-3) He also received a letter in June 1992 stating that the NJDEP had "documented the release of hazardous substances" at the Orbis Site, and asking whether Orbis would participate in a voluntary cleanup program. (ECF no. 136-21 p. 2) Of particular note is a memo William prepared in response to a call from the NJDEP in May of 1984. According to the memo, the NJDEP had expressed concerns about the Orbis property; William, in reply, "assured" the NJDEP representative that:

(1) The Orbis site was NOT abandoned.

(2) We are maintaining a small crew for shipment of material from stock.

(3) Of the drums outdoors, 90% were empties, awaiting shipment to a reconditioner.

(4) The remaining drums were being either repacked or transferred so the material could be sold or reprocessed.

(5) If we did in fact generate a waste, it would be handled properly in accordance with RCRA and N.J.D.E.P. standards.

(ECF no. 136-10 p. 2). William told the representative to contact him "at any time with any questions." (*Id.*) These communications suggest that William may have been a decision-maker regarding environmental issues at the Orbis Site. Indeed, in his testimony, William confirmed that he interacted with regulators on environmental issues. (ECF no. 136-4 p. 15). The inference is, of course, far from inescapable; whether William's involvement attained the level required for operator status is an issue for trial.

Similarly, plaintiffs have presented evidence raising a material issue of fact as to whether William would have arranged for the disposal of waste at the Orbis Site. William testified that he was involved in the decommissioning of the Orbis Site after it was shut down in 1983. (ECF no. 136-4 pp. 12-13). He

explained that the decommissioning of tanks on the property involved "[d]raining the tanks if they had product in them, cleaning the tanks if it was necessary and either selling them or scrapping them." (ECF no. 136-4 p. 12). He also testified that he was involved in the shipment of drums (used to store product/waste) off of the property, as well the shipment of contaminated soil and "sludge," as part of the decommissioning process. (*Id.* pp. 13-14) Separately, he stated that he was one of the individuals who supervised the remediation of environmental issues identified by an NJDEP site visit in 1984. (*Id.* p. 34)

William seems to argue that because his involvement at the Orbis Site took place after Orbis stopped producing products in 1983, he cannot be a PRP.[6] In this respect, I note that plaintiffs have not been precise regarding when the alleged contamination occurred at the Orbis Site. (*See* 2AC ¶¶ 34-35 (alleging that Orbis operated the plant beginning in 1923 until the 1980s and that the contamination occurred "[d]uring the course of its operations")). I gather, however, that they contend that contamination occurred (or continued to occur) even after the plant was no longer productive, and during the process of its decommissioning. The timing of William's involvement at the site, and how that connects to the alleged contamination, is another issue of fact to be determined at trial.

In sum, I will deny William Amaducci's motion for summary judgment as to the CERCLA Section 107 claim.

**b. Robert Amaducci**

I will deny Robert Amaducci's motion for summary judgment for similar reasons. Plaintiffs have submitted evidence of Robert's involvement with environmental issues at the Orbis Site that raises material issues of fact as to operator and arranger status.

For example, as to potential operator liability, Robert was the recipient of William's memo regarding the NJDEP concerns about the Orbis Site, discussed

6 Defendant Robert Amaducci, discussed *infra*, makes the same argument.

*supra.* (ECF no. 136-10 p. 2) And like William, Robert was also involved in regulatory communications involving environmental issues and related operations at the Orbis site. In a letter to the NJDEP in 1987, Orbis expressed its desire to lease a portion of its land to be used as a "waste transfer station." (ECF no. 136-6) Attached to the letter was an affidavit from Robert stating that as Vice President of Orbis he was responsible for "supervision of the activities of the Company at the Property" and that he was "personally familiar with the Property and the activities which take place there." (*Id.* p. 5) Robert was also copied on a letter from Orbis's legal counsel to the NJDEP discussing Orbis's response to various notices of violation that the NJDEP had issued in 1986. (ECF no. 136-11) These communications raise an issue as to Robert's involvement with disposal operations at the property.

With respect to potential arranger liability, Robert testified that "[a]s an officer of Orbis, it was [his] responsibility to oversee the dismantling and the removal of equipment operations from the site." (ECF no. 136-3 p. 27) He also stated that he was aware that drums, sludge, and other items were shipped out of the Orbis site when it was no longer active; he knew such items were sent to disposal sites because he had at times seen manifests relating to their removal. (ECF no. 136-9 p. 25) Reading plaintiffs' allegations to say that contamination occurred in the process of removing such materials from the Orbis Site, there is an issue of fact as to whether Robert arranged for the transport of these materials during the decommissioning of the Orbis Site.

I will therefore deny Robert's motion for summary judgment as to the CERCLA Section 107 claim.

#### c. The Estate of Louis Amaducci

Although plaintiffs present less evidence as to Louis Amaducci, I find it sufficient to preclude summary judgment.

There is a factual issue as to whether Louis had a level of personal involvement in Orbis's environmental decisions and disposal activities sufficient to deem him an operator. It appears that Louis was kept informed about various environmental issues at the Orbis Site. For example, he was

copied on the memo, discussed *supra*, that William Amaducci sent to Robert Amaducci regarding a call from the NJDEP about the site. (ECF no. 136-10) He was also copied on a letter from Orbis's lawyer regarding the proposal to establish a waste transfer site on the Orbis property. (ECF no. 136-22) Louis himself also appears to have raised the issue of the waste transfer site for discussion at a Norda Board meeting. (ECF no. 136-27 p. 32) In addition, William Amaducci testified that in general, he communicated with Louis about actions that were to be taken in response to inspections or letters from the government regarding environmental issues at the Orbis Site. (ECF no. 136-4 p. 15)

Plaintiffs have also raised the question of whether Louis arranged for the disposal of materials from the Orbis Site. William Amaducci indicated that he would have spoken to his father about decommissioning of the site and that a group of Orbis officers, including Louis, would have made decisions about how to handle violations that arose in the course of decommissioning the property (ECF no. 136-4 p. 16) Louis's level of involvement in arranging for the removal of equipment, chemicals, and waste from the Orbis Site is an issue for trial.

I will deny Louis Amaducci's motion for summary judgment as to the Section 107 CERCLA claim.

**d. The Estate of Elena Duke Benedict**

Defendant assumes that former owner, operator, and arranger liability is intended as to Ms. Benedict, and I analyze her status as a PRP accordingly.

Benedict was an officer/director/shareholder of Norda, Orbis's parent company. Accordingly, a finding of potential ownership liability would require a two-step veil-piercing analysis: first, to hold Norda responsible for the actions of Orbis, and second, to hold Benedict responsible for the actions of Norda. While the evidence is not abundant, I find that plaintiffs have presented an issue of fact as to whether the circumstances warrant veil-piercing. Specifically, there is evidence that Benedict lent Norda/Adron millions of dollars to clean up environmental issues at another Norda property in East Hanover, New Jersey. (*See* ECF no. 136-29 pp. 4-5). Indeed, Robert testified that he recalled Ms.

Benedict lending Adron "different sums" of money, and he estimated the total as being at least $5 million. (*See* ECF no. 136-9 p. 9) In addition, there is evidence that Norda made decisions about and supervised the decommissioning of the Orbis Site. William testified that steps he took in connection with removing waste from the Orbis Site was done on behalf of Adron/Norda. (ECF no. 136-4 p. 14). In sum, this evidence presents an issue of fact as to whether corporate formalities were being observed between Orbis and Norda, as well as between Norda and Ms. Benedict.

Plaintiffs have also raised a factual issue as to operator status. Benedict's loans to Norda for environmental cleanup at certain Norda properties suggest that she may have been similarly involved in environmental issues at the Orbis Site. Minutes from the board meetings she led as Chairman of Norda also reflect some level of involvement in environmental decisions relating to the Orbis site. For example, at a meeting on March 19, 1985 the Norda board discussed the disposition of the Orbis plant. (ECF no. 136-27 pp. 17-18) At another meeting on September 5, 1985, they discussed "the current operating status" of the Orbis Site and decided that a "divestiture" of the property was appropriate. (*Id.* pp. 20-21) On May 12, 1987, the board discussed the creation of a waste transfer station at Orbis. (*Id.* pp. 31-32) Whether Benedict's involvement in such decisions rises to the level required for operator liability is an issue of fact for trial.

In addition, I find that this evidence, specifically Benedict's participation in decisions relating to the decommissioning of the Orbis Site, raises issues of fact as to whether she arranged for the disposal of materials from the site. This evidence is limited, but I find that Ms. Benedict's status as an arranger is tied up with her relationship with Norda/Orbis more generally, and that it poses a factual issue for trial.

Thus I will deny the Estate's motion for summary judgment as to this claim.[7]

---

7 In addition to moving for summary judgment, the Estate has renewed its motion to dismiss the complaint against Ms. Benedict for lack of personal jurisdiction.

**e. Flaroma**

Plaintiffs allege that Flaroma "held assets from the operation of the Orbis site at or about the time of the disposal of hazardous substances at the Site." (2AC ¶ 47) Defendant assumes that this is intended as an allegation of ownership liability under Section 107(a)(2), and I analyze Flaroma's PRP status accordingly.

Plaintiff's theory of ownership liability is not fully developed. However, it appears to be that Flaroma operated essentially as an alter-ego of Norda, Orbis's parent company. Plaintiff contends that Norda used Flaroma "to skirt its obligations under its non-compete agreement" with another company and "continue to sell Norda product via sales through its interlocking company, Flaroma." (ECF no. 136 p. 29) Defendant says that there is no corporate link between Flaroma or Orbis—or even Flaroma and Norda—and that Flaroma is an entirely separate company that was founded by Orbis officers, William and Robert Amaducci.

In support of their theory, plaintiffs point to the fact that Flaroma was created so that Norda could get around a non-compete agreement it had with

---

Judge Chesler previously denied that motion without prejudice and allowed for limited jurisdictional discovery. (ECF no. 103) Plaintiff contends that there is specific jurisdiction over the Estate of Ms. Benedict, a non-resident. Defendant argues that it would be unfair to drag a New York resident into court in New Jersey based on her position at Norda.

Specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiff's claims. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413-14, 104 S. Ct. 1868 (1984). Establishing specific jurisdiction requires a three-part inquiry: (1) whether the defendant purposefully directed its activities at the forum; (2) whether the litigation arises out of or relates to at least one of the contacts; and (3) whether the exercise of jurisdiction otherwise comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). I find that there is specific jurisdiction here. I have allowed the CERCLA claims in this case to proceed, in part based on Benedict's lending of money to Norda in order to cleanup a property it owned in New Jersey. Thus, I find that the claims in this case do arise from specific actions by Benedict directed at New Jersey. In addition, I do not find that the assertion of personal jurisdiction is unfair or unreasonable. Based on Benedict's status as Chairman of Norda, and Norda's ownership of properties in New Jersey, which Benedict was aware of and discussed, I believe she could have "reasonably anticipate[d] being haled into court" in New Jersey. *World–Wide Volkswagen Corp.*, 444 U.S. 286, 297, 100 S. Ct. 559 (1980).

another company. (*See* ECF no. 136-4 p. 22) Plaintiffs also note that Flaroma had no assets (other than the cash provided by its founders) and no employees of its own, as a sign that it is essentially Norda operating in another form. (*See id.*) In addition, plaintiffs point out that Flaroma borrowed start-up capital from Orbis in the amount of $200,000. (*See* ECF no. 136-9 p. 6) They suggest that this reflects that Norda/Orbis/Flaroma were operating as interchangeable entities.

While the evidence linking Flaroma to Orbis is limited, I find that plaintiffs have raised an issue of fact as to the relationship between Flaroma/Norda/Orbis. Any finding of ownership status, however, will depend on whether the corporate veil can be pierced in such a way as to reach Flaroma. *See* Section III.A.1.i, *supra*. Such a finding would, at a minimum, entail a two-step piercing analysis—(1) from Orbis to its parent Norda, and (2) from Norda to Flaroma. This is certainly not an easy burden to meet, but I will give plaintiffs the opportunity to try to do so.

In sum, I find that plaintiffs have raised a sufficient issue of fact as to Flaroma's status as an owner of Orbis, and I will deny Flaroma's motion for summary judgment as to the CERCLA Section 107 claim.

**ii. Contribution (Counts II-III)**

Section 113 of CERCLA provides a form of relief separate from that of Section 107. "[T]he remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances." *Agere Systems, Inc. v. Advanced Environmental Technology Corp.*, 602 F.3d 204, 218 (3d Cir. 2010) (citing *United States v. Atl. Research Corp.*, 551 U.S. 128, 139, 127 S. Ct. 2331 (2007)) (internal quotations and citations omitted). The Third Circuit has stated:

> Section 113(f) specifically is a second means of recouping cleanup costs, and it, in turn, provides two avenues of relief. Under § 113(f)(1), a PRP can seek contribution from another PRP during or following a CERCLA suit brought against the first PRP ... Likewise, under § 113(f)(3)(B), PRPs who resolve their liability to the United States or an individual State through an administratively or judicially approved settlement can seek contribution from another

PRP.

*Agere*, 602 F.3d at 217 (citations omitted); *see Atl. Research*, 551 U.S. at 132 n.1 ("Section 113(f)(1) permits private parties to seek contribution during or following a civil action under § 106 or § 107(a) ... Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the Government.") (citations omitted).

In their opposition brief, Plaintiffs focus their argument on Section 113(f)(3)(B).[8] They rely on a settlement that one of the plaintiffs, the City of Newark, reached with a private party, McClellan Street Urban Renewal, LLC ("McClellan") in June 2008. The settlement required the City of Newark to provide for environmental cleanup of the Orbis Site. (*See* ECF no. 136 p. 43) Plaintiff Virginia Street, by way of separate agreement, was also required to undertake cleanup measures. Plaintiffs assert that they are entitled to contribution from defendants for their obligations under the settlement.

In support of their contribution claim, plaintiffs point to the Third Circuit's decision in *Trinity Indus. v. Chi. Bridge & Iron Co.*, 735 F.3d 131 (3d Cir. 2013). *Trinity* held that a settlement need not explicitly resolve CERCLA liability to warrant contribution under Section 113(f)(3)(B). *Id.* at 136. In *Trinity*, however, there was a settlement, not with a private party, but with "the United States or a state" (specifically, the state Department of Environmental Protection) as required by the language of Section 113(f)(3)(B). *Id.* at 133; *see* 42 U.S.C. § 9613(f)(3)(B). In this case, the City of Newark entered into a settlement with a purely private party—McClellan. On the facts of this case, I find that Section 113(f)(3)(B) does not apply.

I will therefore grant the motions for summary judgment as to Count III, which is dismissed in its entirety as to all defendants.

In addition, I will award defendants summary judgment as to Count II, which is a request for "contribution" under Section 107. As discussed above,

---

8 Plaintiffs also cite Section 113(f)(1) in the 2AC. That section of the statute is inapplicable because "neither plaintiff is claiming to be "a PRP seeking contribution ... following a CERCLA suit against" it. *Agere*, 602 F.3d at 217.

an action for contribution arises under Section 113, not 107. *See Bonnieview*, 655 F. Supp. 2d at 489 ("Section 107(a) provides a right to *cost recovery* in certain circumstances, whereas § 113 provides for a separate right to *contribution* in other circumstances.") (citation omitted) (emphasis in original).

**B. New Jersey State Statutory Claims**

**i. Spill Act (Counts IV-V)**

Like CERCLA, New Jersey's Spill Act is "a strict liability statute that prohibits the discharge of hazardous substances." *Bonnieview, 655 F. Supp. 2d at 503* (citation omitted). In relevant part, it provides:

> Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs, no matter by whom incurred.

N.J. Stat. Ann. § 58:10–23.11g(c)(1). The statute defines "cleanup and removal costs" as "all direct costs associated with a discharge, and those indirect costs that may be imposed by the [NJDEP] ...." N.J. Stat. Ann. § 58:10–23.11b.

In 1992, the legislature amended the Spill Act to clarify that a private party may bring an action for contribution so that dischargers are required to pay their fair share of cleanup costs. *See SC Holdings, Inc. v. A.A.A. Realty, Co.*, 935 F. Supp. 1354, 1365 (D.N.J. 1996). This Section provides:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

N.J. Stat. Ann. § 58:10–23.11f(a)(2)(a).

Analysis under the Spill Act is similar to that under CERCLA. *See Morton*, 343 F.3d at 684 ("Because the Spill Act is the New Jersey analog to CERCLA, the standards for liability are the same.") (internal quotations and citation omitted). Liability is broad, and "a party even remotely responsible for causing contamination will be deemed a responsible party under the Act." *Ford*

*Motor Co. v. Edgewood Properties, Inc.*, Civ. Nos. 06-1278, 06-4266, 08-774, 2012 WL 4172133, at *18 (D.N.J. Aug. 31, 2012) (internal quotations and citation omitted). However, a plaintiff must demonstrate that there was a "reasonable nexus between the discharge of waste for which the defendant is responsible and the contamination at the site." *Litgo*, 725 F.3d at 392 (internal quotations and citation omitted).

I find that there are sufficient factual issues to preclude summary judgment as to Count V, plaintiffs' claim for contribution under the Spill Act. For example, as discussed in connection with plaintiffs' CERCLA claims, there are issues as to each defendant's connection and potential involvement with contamination at the Orbis Site. One issue for trial will be whether plaintiffs can establish the causal nexus required by the Spill Act. Another issue is whether plaintiffs have expended "cleanup and removal costs" as defined by the statute. *See* N.J. Stat. Ann. § 58:10–23.11b. In sum, I will deny the request for summary judgment as to Count V.

I consider Count IV, which is not a claim for contribution, but rather a claim for "cost recovery" under the Spill Act. Aside from the right to contribution described above, however, the Spill Act does not provide any private right of action for cleanup costs. *See Sandvik, Inc. v. Hampshire Partners Fund VI, L.P.*, Civ. No. 13-4667, 2014 WL 1343081, at *8 (D.N.J. April 4, 2014) (dismissing claim for cost recovery, and proceeding to consider contribution claim, because "[i]t is well-settled that the Spill Act does not provide a private right of action for recovery of cleanup costs and other damages") (citation omitted); *see also SC Holdings*, 935 F. Supp. at 1365. I will therefore award summary judgment for defendants as to Count IV.

#### ii. Joint Tortfeasors Contribution Law, Comparative Negligence Act, and Declaratory Judgment Act (Count VI)

Plaintiffs assert a general claim for "contribution" under the New Jersey Joint Tortfeasors Contribution Law, N.J. Stat. Ann. § 2A:53A-1 *et seq.* This statute applies when "an injury or damage is suffered ... as a result of the wrongful act, neglect or default of joint tortfeasors and one of the joint

tortfeasors pays more than his pro rata share of the damage." *Interfaith Comm. Organization v. Honeywell International, Inc.*, 263 F. Supp. 2d 796, 870 (D.N.J. 2033) (internal quotations and citation omitted). The party claiming contribution must prove that the party from which he seeks contribution is a "joint tortfeaser," *id.* at 871, which the statute defines as "two or more persons jointly or severally liable in tort for the same injury to person or property." N.J. Stat. Ann. § 2A:53A-1.

This statute does not apply to the situation presented here. It provides a basis for tortfeasors, generally defendants, to allocate damages amongst themselves. Here, however, the parties asserting a joint-tortfeasors claim are the Plaintiffs. But Plaintiffs do not allege that they themselves are jointly liable with defendants as tortfeasors; their theory is that the defendants are jointly responsible, amongst themselves, for the damage at the Orbis Site. Accordingly, I will grant defendants' motion for summary judgment and dismiss this claim.

In Count VI, plaintiffs also reference the New Jersey Comparative Negligence Act, N.J. Stat. Ann. § 2A:15-5.1 *et seq.*, and the New Jersey Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-50 *et seq.* It is not clear that these are intended as causes of action, but I address them briefly because the parties do. The Comparative Negligence Act instructs the trier of fact on apportioning liability in negligence and strict liability cases with multiple tortfeasors. *See* N.J. Stat. Ann. § 2A:15-5.2. The Declaratory Judgments Act provides that a person whose rights "are affected by a statute ... may obtain a declaration of rights ... thereunder." N.J. Stat. Ann. § 2A:16-53. As discussed *supra*, numerous issues of material fact remain in this case, and a declaratory judgment makes little sense when issue has been joined. Whether these statutes are or may be become applicable is a question for a later date. I will consider their applicability at the appropriate time.

In sum, I will grant the motion for summary judgment as to Count VI to the extent it is a claim for contribution under the New Jersey Joint Tortfeasors

Contribution Act. The other statutes' applicability remains to be determined, and may ultimately be moot.

**C. NJ Common Law Claims**

**i. Nuisance and Trespass (Counts VII-VIII)**

"Trespass constitutes the unauthorized entry (usually of tangible matter) onto the property of another." *EPEC Polymers, Inc. v. NL Industries, Inc.*, Civ. No. 12-3842, 2013 WL 2338711, at *12 (D.N.J. 2013) (citations omitted). A claim of private nuisance exists when there has been "an unreasonable, unwarranted or unlawful use by a person of his real property which is resulting in a material annoyance, inconvenience or hurt." *New Jersey Turnpike Authority,* 16 F. Supp. 2d at 478 (internal quotations and citation omitted).[9] Private nuisance is "confined to situations where one's property use interferes with another's use of neighboring or adjoining land." *Id.* (citation omitted).

"New Jersey courts have moved toward a strict liability theory with respect to environmental pollution cases and away from such common law claims as trespass and nuisance." *Rowe v. E.I. Dupont De Nemours and Co.*, 262 F.R.D. 451, 458-59 (D.N.J. 2009); *EPEC Polymers*, 2013 WL 2338711, at *13 (same); *see also Kenney v. Scientific, Inc.*, 204 N.J. Super. 228, 255-56 (1985)("There is no need for us to be obsessed with labels, and to endeavor to torture old remedies to fit factual patterns not contemplated when these remedies were fashioned."). Under such reasoning, courts have dismissed claims for nuisance brought by successor landowners. *See Allied Corp. v. Frola*, 730 F. Supp. 626, 630 (D.N.J. 1990)(rejecting nuisance claim brought by successor landowner and noting that the "proper tort theory to be applied in conflicts between successive landowners is that of strict liability"); *Mayor and Council of the Borough of Rockaway v. Klockner & Klockner*, 811 F.Supp 1030, 1057 (D.N.J. 1993)(dismissing claim and holding that a successor landowner

9 In contrast, a public nuisance exists where there is an "unreasonable interference with a right common to the general public." *Rowe*, 262 F.R.D. at 463 (citation omitted). Though plaintiff references both public and private nuisance in the 2AC, a public nuisance does not appear applicable on the facts alleged here. The plaintiffs' brief is silent as to the distinction.

cannot assert a private nuisance claim against a predecessor landowner). Trespass claims based on environmental pollution have also been rejected. *See In re Paulsboro Derailment Cases*, Civ. Nos. 13-784, 12-7586, 13-410, 13-721, 13-761, 2013 WL 5530046, at *8 (D.N.J. Oct. 4, 2013)(dismissing trespass claim in part because "modern courts do not favor trespass claims for environmental pollution") (citing *Woodcliff, Inc. v. Jersey Const., Inc.*, 900 F. Supp. 2d 398, 402 (D.N.J. 2012)).

I agree with this reasoning, and I will enter summary judgment in favor of defendants as to the claims of nuisance and trespass, which in any event appear to be superfluous.

**ii. Strict Liability (Count IX)**

To establish a claim for strict liability, plaintiffs must demonstrate that "(1) the defendant's disposal of waste constituted an 'abnormally dangerous activity,' and (2) that such activity has harmed the plaintiff." *Bonnieview*, 655 F. Supp. 2d at 519 (citations omitted). In order to assess whether an activity is abnormally dangerous, New Jersey courts consider six factors:

(a) the existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) the likelihood that the harm that results from it will be great;

(c) the inability to eliminate the risk by the exercise of reasonable care;

(d) the extent to which the activity is not a matter of common usage;

(e) the inappropriateness of the activity to the place where it is carried on; and

(f) the extent to which its value to the community is outweighed by its dangerous attributes.

*Id.*

I find that this claim will depend on each defendant's involvement in the environmental disposal activities at the Orbis Site, as well as what those activities were, which are the very factual issues that I have found require trial. I will thus deny the motion for summary judgment as to the strict liability claim.

**iii. Tortious Contamination (Count X)**

Defendants contend that a cause of action for "tortious contamination" does not exist under New Jersey law. I agree. Plaintiffs cite to only one decades-old New Jersey case in which the term was used, apparently in passing. *See Ayers v. Jackson Twp.*, 106 N.J. 557, 618, 525 A.2d 287, 318–19 (1987). I will grant summary judgment in defendants' favor as to this claim.

**iv. Indemnification (Count XI)**

Common law indemnification is "an equitable doctrine that allows a court to shift the cost from one tortfeaser to another." *EPEC Polymers*, 2013 WL 2338711, at *13 (internal quotations and citation omitted). There are two situations under which a right to indemnification arises: (1) when a contract expressly provides for it, and (2) "when a special legal relationship creates an implied right of indemnity." *Id.* (internal quotations and citation omitted). A non-exhaustive list of special relationships include "principal-agent, employer-employee, lessor-less, and bailor-bailee." *Id.* (internal quotations and citation omitted). Plaintiffs argue that indemnification is appropriate here in connection with the settlement between the City of Newark and McClellan, discussed *supra*.

I find that the question of indemnification is tied up with factual issues to be addressed at trial. For example, it requires an assessment of whether any defendants are tortfeasors responsible for contamination at the Orbis Site, as well as whether any special relationship exists sufficient to warrant indemnification under common law. I therefore will deny defendants' motion for summary judgment.[10]

---

10 In some cases, courts have found common law indemnification claims to be preempted by CERCLA. *See Litgo New Jersey, Inc. v. Bob Martin*, No. 06-2891, 2010 WL 2400388, at *36 (D.N.J. June 10, 2010), *rev'd in part on other grounds, Litgo New Jersey, Inc. v. Comm'r New Jersey Dep't of Environmental Protection*, 725 F.3d 369 (3d Cir. 2013), (citing *Morton*, 343 F.3d at 685); *see also In the Matter of Reading Co.*, 115 F.3d 1111, 117 (3d Cir. 1997). I agree that such a claim would be preempted if it were premised on CERCLA liability, because CERCLA contains its own contribution provision. Here, however, the plaintiffs' claim for indemnification is tied to a civil settlement that is not facially based on CERCLA liability. *See Rhodia, Inc., v. Bayer Cropscience, Inc.*, Civ. No. 04-6424, 2007 WL 3349453, at *10 (D.N.J. Nov. 7,

**v. Restitution (Count XII)**

Plaintiffs also argue that they are entitled to restitution from defendants relating to the settlement with McClellan. The claim for restitution is couched as one for unjust enrichment.[11] To establish unjust enrichment, the plaintiff must show that "the defendant received a benefit from it and that retention of that benefit without payment would be unjust." *New Jersey Turnpike Authority*, 16 F. Supp. 2d at 481 (citation omitted).

Plaintiffs' argument for unjust enrichment appears to be that they bore the obligation of cleaning up the land while defendants benefited by the "transfer/disposal of the property to plaintiffs." (ECF no. 136 p. 58) However, plaintiffs have not even identified a benefit that defendants unjustly retained without payment, which is the essence of such a claim. Indeed, the Orbis Site came to be owned by the City not by a sale between the parties, but as a result of foreclosure. On this record, I find that plaintiffs have not raised an issue of fact for trial, and I will grant summary judgment as to the restitution/unjust enrichment claim.[12]

---

2007)(noting that common law indemnification claim would be preempted if it were "based on actual or potential CERCLA liability," but allowing the claim to proceed because the claim for indemnification might relate to "administrative actions" against the plaintiff pursuant to "other statutory schemes" separate from CERCLA).

[11] The 2AC alleges a claim of restitution, which plaintiffs' brief addresses as one for unjust enrichment.

[12] In addition, some courts have found that common law unjust enrichment claims are preempted by CERCLA. *See North River Mews Associates, LLC v. Alcoa Corp.*, No. CV 14-8129, 2016 WL 2930508, at *4 (D.N.J. May 19, 2016)("Federal preemption precludes unjust enrichment claims in CERCLA's environmental cleanup context."); *Lenox Inc. v. Reuben Smith Rubbish Removal*, 91 F. Supp. 2d 743, 753 (D.N.J. 2000).

## IV. CONCLUSION

For the foregoing reasons, I will partially grant defendants' motions for summary judgment. (ECF nos. 120-122) The motions are granted to the extent that Counts II, III, IV, VI (the Joint Tortfeasors Contribution Law), VII, VIII, X, and XII are dismissed. As to all other counts, the motions are denied. In addition, the Estate of Elena Duke's motion to dismiss for lack of personal jurisdiction is denied. An appropriate order is filed with this opinion.

Dated: August 3, 2016
Newark, New Jersey

**KEVIN MCNULTY**
**United States District Judge**